IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-51

No. 138A21

Filed 6 May 2022

IN THE MATTER OF: C.A.B.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order terminating respondent-father's parental rights entered on 2 February 2021 by Judge Kathryn Whitaker Overby in District Court, Alamance County. Heard in the Supreme Court on 22 March 2022.

*Jamie L. Hamlett for petitioner-appellee Alamance County Department of Social Services.*

*Christina Freeman Pearsall for appellee Guardian ad Litem.*

*Mercedes O. Chut for respondent-appellant father.*

EARLS, Justice.

¶ 1    In this case we consider whether a parent who was incarcerated at the time of an adjudicatory hearing on a motion to terminate his parental rights was entitled to a continuance in order to have the opportunity to be present at the hearing. Respondent-father was incarcerated when he first learned that he was the father of a newborn, Caleb,[1] and he remained in detention throughout the duration of Caleb's juvenile proceedings. He expressed a desire to parent Caleb upon his release and

---

[1] We use a pseudonym to protect the identity of the juvenile and for ease of reading. *See* N.C. R. App. P. 42(b). The juvenile's mother is not a party to this appeal.

opposed the effort to terminate his parental rights. On the day of the adjudicatory hearing, respondent-father was unable to appear due to a lockdown at his prison necessitated by the COVID-19 pandemic. According to respondent-father's counsel, the lockdown was set to expire in five days. Nonetheless, the trial court denied respondent-father's motion to continue the hearing and ultimately entered an order terminating his parental rights.

¶ 2      Parents, including incarcerated parents, possess a "fundamental liberty interest[ ]" which "includes the right of parents to establish a home and to direct the upbringing and education of their children." *Owenby v. Young*, 357 N.C. 142, 144 (2003) (cleaned up). Thus, "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *In re Murphy*, 105 N.C. App. 651, 653 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982)), *aff'd per curiam*, 332 N.C. 663 (1992). In this case, respondent-father was denied the opportunity to present testimony at the termination hearing and to work with his counsel to develop and execute a strategy to oppose termination of his parental rights. Furthermore, the substantive findings in support of the trial court's decision to terminate respondent-father's parental rights all directly related to his conduct in prison, a subject respondent-father's testimony would have aided the court in assessing. Accordingly, the trial court's denial of respondent-father's motion to continue the adjudicatory hearing undermined the fairness of that hearing. We

conclude that the trial court prejudicially erred and we vacate the order terminating respondent-father's parental rights.

## I. Background.

On 28 January 2019, the Alamance County Department of Social Services (DSS) assumed custody of Caleb, who was four days old, after his mother tested positive for cocaine at Caleb's birth. No father was listed on Caleb's birth certificate, but Caleb's mother identified respondent-father as a possible biological father. At the time of Caleb's birth, respondent-father was detained on federal charges including obtaining property by false pretenses, possession of stolen goods, and possession of a firearm by a felon. Eleven days after DSS took custody of Caleb, respondent-father took a paternity test which established to a near certainty that he was Caleb's biological father.

On 14 March 2019, a DSS social worker visited respondent-father at the Alamance County Detention Center, where he was being held pending the resolution of the federal charges against him. At the time, respondent-father told the social worker that he thought he was "looking at three years in prison," but that he "would like for his son to be with family" and "would like to work to regain custody of his son when he is released from prison." He identified three relatives as potential alternative caregivers. None of the three relatives agreed to take custody of Caleb; however, the social worker subsequently learned that respondent-father's sister, Larissa, was

willing to care for Caleb if she could also adopt him. DSS ordered a home study to determine if Larissa would be a suitable placement.

¶ 5        Before the home study was completed, Caleb was adjudicated to be a neglected and dependent juvenile. DSS retained nonsecure custody. The court approved a case plan proposed by DSS requiring respondent-father to:

- Develop a sufficient source of income to support himself and the child and use funds to meet basic needs. He can work to achieve this goal by applying for a minimum of five jobs a week, submitting monthly job search log[s] and taking part in job-readiness programs.

- Provide a safe, stable and appropriate home environment. He can work to achieve this goal by applying for housing at five locations a week and providing a monthly log to the social worker, saving sufficient funds for deposits, complying with the terms of his lease, maintaining the home in a fit and habitable condition and keeping working utilities.

- Refrain from allowing his substance abuse to affect his parenting of his child and provide a safe, appropriate home by not exposing his child to an injurious environment.

- Obtain and follow the recommendations of a substance abuse assessment, refrain from using illegal or illicit substances or abusing prescription medication[s], provide a home environment free of illegal or illicit substances and/or persons who are using or under the influence of such.

- Demonstrate the ability to implement age-appropriate disciplinary practices and parenting skills.

- Attend a parenting curriculum and demonstrate appropriate skills during visitation.

Although the trial court noted that respondent-father's "visitation is suspended due to the limits of visits in the Alamance County [detention center]," the court did not otherwise adapt respondent-father's case plan to reflect the circumstances of his incarceration.[2]

¶ 6  Subsequently, DSS received a favorable home study for Larissa and her husband, and Caleb was placed in their home on 3 May 2019. To facilitate Caleb's adoption by Larissa, respondent-father executed a relinquishment of his parental rights specifically to his sister and brother-in-law. Caleb's mother also relinquished her parental rights. Both parents were released as parties to Caleb's juvenile proceedings. In April 2020, DSS received final approval for Larissa and her husband to adopt Caleb.

¶ 7  But, later that same month, Larissa informed DSS that she "feels overwhelmed with everything that is going on in her life right now." She also expressed concern that, notwithstanding their relinquishments, respondent-father and Caleb's mother "are going to want to be in and out of his life because [they are] family once [Caleb's] adopted." Larissa explained that she had arrived at the conclusion "that she just couldn't keep [Caleb]" and that it was "in his best interest . . . to go to a deserving

_____

[2] The trial court also developed a separate case plan for Caleb's mother but that plan is not at issue in this appeal.

family . . . where his birth parents couldn't mess up his life." On 4 May 2020, DSS notified respondent-father and Caleb's mother that Larissa's adoption of Caleb would not go forward. Respondent-father subsequently revoked his specific relinquishment of his parental rights. Caleb was removed from Larissa's home and placed with foster parents.

¶ 8 On 15 July 2020, the trial court restored respondent-father as a party to Caleb's juvenile proceedings and appointed him an attorney. DSS had difficulty establishing contact with respondent-father, who by this time was being held at the Beckley Federal Correctional Institution in West Virginia. Eventually, respondent-father notified DSS and the court that he "no longer wanted [Caleb] to be adopted by someone new because he had already gotten a full year closer to being released since he initially executed his specific relinquishment." Respondent-father asserted that he "has not had any write-ups or engaged in any trouble since his incarceration in May of 2018," "has taken courses at the prison in order to be a better father for [Caleb]," and "has a job in the penitentiary kitchen"; in addition, he stated that he "started a rehabilitation program for drug abuse" and signed up to "take a parenting class" but that both had been suspended due to COVID-19. Respondent-father also provided the names of additional relatives to be considered as potential placements for Caleb, including respondent-father's own parents.

¶ 9 On 12 August 2020, the trial court approved an updated case plan requiring

respondent-father to

> participate in Parenting classes through the prison . . .
> demonstrate appropriate and safe parenting choices . . .
> maintain communication with [DSS] . . . engage in Mental
> Health services provided through the prison . . .
> demonstrate good coping skills . . . participate in his 100-
> hour rehab program through the prison . . . help provide for
> the needs of [Caleb] . . . give consent for his case manager
> to provide [DSS with] information regarding his stay in
> prison . . . [and] upon [his] release from prison . . . engage
> in activities to obtain and maintain an appropriate home
> for he and [Caleb]; . . . maintain a way to meet the[ir] daily
> needs . . . [and] refrain from illegal activities that could
> cause him to be arrested and incur more prison time . . . .

The court maintained a primary plan of adoption with a secondary plan of
guardianship and ordered DSS to perform a home study of Caleb's paternal
grandparents. The trial court later determined that "though the paternal
grandparents have a suitable home and the financial ability to provide for the
Juvenile . . . [Caleb] should remain in the current foster placement progressing to
adoption by the [f]oster [f]amily."

¶ 10        On 28 August 2020, DSS filed a motion in the cause seeking termination of
respondent-father's parental rights. DSS asserted that termination was warranted
on four grounds: neglect pursuant to N.C.G.S. § 7B-1111(a)(1); willful failure to make
reasonable progress to correct the conditions that led to Caleb's removal pursuant to
N.C.G.S. § 7B-1111(a)(2); willful failure to pay a reasonable portion of Caleb's cost of
care pursuant to N.C.G.S. § 7B-1111(a)(3); and incapability to provide for Caleb's

proper care and supervision pursuant to N.C.G.S. § 7B-1111(a)(6). A hearing on the motion to terminate parental rights was initially set for 21 October 2020; however, this hearing was continued at respondent-father's counsel's request because counsel was "not available for [the] hearing." A subsequent hearing scheduled for 16 December 2020 was continued until 20 January 2021 due to the renewal of an Emergency Directive issued by then-Chief Justice Beasley in response to the ongoing COVID-19 pandemic.

¶ 11        On 12 January 2021, respondent-father's counsel filed a motion to continue the upcoming adjudicatory hearing on DSS's motion to terminate. In the motion, respondent-father's counsel explained that respondent-father's case manager had informed him

> that the federal penitentiary [where respondent-father was being held] was under lockdown due to COVID-19 until January 25, 2021 and no movement is permitted until that date. As such, [respondent-father] will not be available to call-in nor in any other way participate in the hearing scheduled for January 20, 2021.

At the adjudicatory hearing, the trial court heard from respondent-father's counsel in support of the motion, and from DSS and the guardian ad litem (GAL) in opposition. The trial court denied respondent-father's motion to continue the hearing. In a subsequent written order, the trial court explained:

> 3. That this motion to terminate parental rights was filed August 28, 2020 and initially scheduled for hearing on October 12, 2020. That hearing was continued at the

request of the father's attorney and scheduled for December 16, 2020. That hearing was continued at no fault of anyone involved in this matter.

4. [Respondent-father's counsel] reports the lock down is scheduled to be lifted January 25, 2021. However, no one knows for sure how COVID-19 will continue to impact the prison system.

5. That hearings on motions to terminate parental rights are required to be heard within 90 days of filing. This case is already outside the required timeframe. The father and his attorney have had an extended period of time to prepare for this matter.

6. That the Respondent Father's attorney will be present at the hearing and permitted to cross exam witnesses and present evidence. That the father's report is admitted into evidence as well as his exhibits by the consent of the parties. These processes assure the due process rights of the father are being honored and the adversar[ial] nature of the proceeding is preserved.

7. The Respondent Father and the Alamance County Department of Social Services both have a commanding interest in this proceeding.

8. That due to the fundamental fairness of the process, representation of counsel for the father and other processes, the risk of error by not having the father present is low.

Based on these findings, the trial court concluded that the motion to continue should be denied because respondent-father's "due process and constitutional safeguards are being adequately observed and protected through the nature of these proceedings."

¶ 12 After denying respondent-father's motion to continue, the trial court conducted an adjudicatory hearing on DSS's motion to terminate respondent-father's parental

rights. During the hearing, DSS presented testimony from a DSS social worker. Respondent-father's counsel presented testimony from Caleb's paternal grandfather, Larry, who stated that respondent-father had called him on the morning of the hearing because respondent-father had been "let . . . out" of lockdown for about thirty minutes. At the dispositional stage, the court heard testimony from Caleb's GAL. The trial court also considered a three-page report prepared by counsel which asserted that respondent-father had attained an "unblemished discipline history while incarcerated;" was "actively engaging in classes to better himself so that he can be a better parent to [Caleb];" and had "sent [Caleb] thirty-five dollars" and "two hand-made cards." In addition, the report further argued it was "not in [Caleb's] best interests for [respondent-father's] parental rights to be terminated." On the basis of this evidence, the trial court concluded that DSS had proven the existence of all four grounds for termination and that terminating respondent-father's parental rights was in Caleb's best interests.

¶ 13      On 11 February 2021, respondent-father timely filed a notice of appeal pursuant to N.C.G.S. § 7B-1001(a1)(1).

## II.      Standard of review.

¶ 14      The standard of review utilized by an appellate court in reviewing a trial court's denial of a party's motion to continue varies depending on the reason the party sought the continuance. "Ordinarily, a motion to continue is addressed to the

discretion of the trial court, and absent a gross abuse of that discretion, the trial court's ruling is not subject to review." *State v. Walls*, 342 N.C. 1, 24 (1995). "If, however, the motion is based on a right guaranteed by the Federal and State Constitutions, the motion presents a question of law and the order of the court is reviewable" de novo. *State v. Baldwin*, 276 N.C. 690, 698 (1970); *see also State v. Johnson*, 379 N.C. 629, 2021-NCSC-165, ¶ 16 ("Defendant's motion to continue raised a constitutional issue, requiring de novo review by this Court.").

¶ 15        "[A] parent enjoys a fundamental right 'to make decisions concerning the care, custody, and control' of his or her children under the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Adams v. Tessener*, 354 N.C. 57, 60 (2001) (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). Accordingly, as noted above, "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *In re Murphy*, 105 N.C. App. at 653 (quoting *Santosky*, 455 U.S. at 753–54). At an adjudicatory hearing, a respondent-parent must be afforded an adequate opportunity to present evidence "enabl[ing] the trial court to make an independent determination" regarding the facts pertinent to the termination motion. *In re T.N.H.*, 372 N.C. 403, 409 (2019). Thus, when a parent is unable to attend a termination hearing as a result of the trial court's refusal to grant a continuance, that parent's constitutional due process rights may be implicated.

¶ 16 Nonetheless, even if a motion to continue implicates a parent's constitutional parental rights, a reviewing court will only review a denial of the motion de novo if the respondent-parent "assert[ed] before the trial court that a continuance was necessary to protect a constitutional right." *In re S.M.*, 375 N.C. 673, 679 (2020). If the respondent-parent fails to assert a constitutional basis in support of his or her motion to continue, "that position is waived and we are constrained to review the trial court's denial of [a] motion to continue for abuse of discretion." *Id.* In this case, the constitutional basis for respondent-father's motion to continue was apparent from the motion itself, in which respondent-father's counsel expressly argued that

> the proper administration of justice and any reasonable understanding of due process demands [respondent-father's] presence at this hearing to determine if the state will strip him of his constitutionally protected parental rights. [Respondent-father] has a fundamental right to participate in the state's efforts to deny him his constitutional rights to care for his child. [Respondent-father] strenuously objects to the state's efforts to terminate his parental rights over his minor child. In order to defend his rights [respondent-father] will testify at this hearing. This will be an impossibility if a continuance is not granted.

Accordingly, we review the trial court's denial of respondent-father's motion to continue the termination hearing de novo.

### III. Analysis.

¶ 17 To establish that a termination order entered after a trial court has denied a

motion to continue should be overturned, a respondent-parent must "show[ ] both that the denial was erroneous, and that [the respondent-parent] suffered prejudice as a result of the error." *In re A.L.S.*, 374 N.C. 515, 517 (2020) (quoting *Walls*, 342 N.C. at 24–25). In support of their assertion that the trial court did not err, DSS and the GAL echo two justifications the trial court relied upon in support of its denial of respondent-father's request for a continuance. First, they argue that the trial court did not err in denying the motion because "the matter was outside of the [ninety]-day statutory period, with two continuances having already been granted, one of which was requested by respondent[-]father's attorney." Second, they argue that the trial court did not err in denying the motion because the court appropriately "weighed and balanced the rights and interest[s] of all involved, assuring the father's due process rights were secured" by conducting the hearing in a manner that "preserved the adversarial nature of the proceedings and assured the father had more than adequate representation." With respect to prejudice, they argue that respondent-father has failed to demonstrate that his testimony "would have presented any evidence not already provided to the court," especially given that respondent-father's rights "were protected by counsel." We address each argument in turn.

**A. The trial court erred to the extent it determined that the lockdown at respondent-father's detention facility was not an "extraordinary circumstance[ ]" within the meaning of the Juvenile Code.**

¶ 18        Under North Carolina's Juvenile Code, a trial court may continue an

adjudicatory hearing on a motion or petition to terminate a parent's parental rights for up to ninety days "for good cause shown." N.C.G.S. § 7B-1109(d) (2021). A trial court may also continue an adjudicatory hearing to a date more than ninety days past the date the motion or petition was filed, but "[c]ontinuances that extend beyond 90 days after the initial petition shall be granted only in *extraordinary circumstances* when necessary for the proper administration of justice." *Id.* (emphasis added). In this case, when respondent-father filed the motion to continue at issue on appeal, more than ninety days had already passed since DSS initially filed its termination motion. Indeed, the trial court had already determined that "extraordinary circumstances" justified continuing two previously scheduled adjudicatory hearings beyond the statutory ninety-day period: first, when respondent-father's counsel noted a scheduling conflict, and second, when then-Chief Justice Beasley renewed a COVID-19 Emergency Directive.

¶ 19      The trial court did not expressly state that respondent-father's motion failed to present an "extraordinary circumstance[ ]" within the meaning of N.C.G.S. § 7B-1109(d). But the trial court did refer to this statutory requirement in noting that "[t]his case is already outside the required timeframe." Still, even if it is correct that a trial court should consider the overall amount of time that has elapsed when ruling on a motion to continue filed more than ninety days after the filing of a termination motion, a trial court is not entitled to ignore the nature of the circumstances

presented in support of the continuance motion. "Extraordinary circumstances" may occur both within and beyond ninety days after the filing of a termination motion or petition.

¶ 20    Here, the trial court had previously concluded that a disruption caused by the COVID-19 pandemic was an "extraordinary circumstance[ ]" permitting it to exercise its authority to grant a continuance pursuant to N.C.G.S. § 7B-1109(d). Logically, another disruption caused by the COVID-19 pandemic, one which precluded respondent-father from attending the adjudicatory hearing, was also an "extraordinary circumstance[ ]" permitting the trial court to exercise its authority to grant a continuance pursuant to N.C.G.S. § 7B-1109(d). While the trial court was certainly correct in noting that "no one knows for sure how COVID-19 will continue to impact the prison system," the fact that the court was confronted with an unprecedented and rapidly evolving situation supports rather than detracts from the conclusion that respondent-father's motion presented an "extraordinary circumstance[ ]" within the meaning of N.C.G.S. § 7B-1109(d).

¶ 21    This conclusion does not necessarily mean that the trial court reversibly erred in denying respondent-father's motion to continue. As previously noted, determining that a motion to continue presents an "extraordinary circumstance[ ]" does not *require* a trial court to continue the hearing under N.C.G.S. § 7B-1109(d). But our conclusion that respondent-father's motion to continue did present an "extraordinary

circumstance[ ]" does foreclose upon the argument that the trial court necessarily could not have erred because it lacked the authority to continue an adjudicatory hearing beyond ninety days under our Juvenile Code. Accordingly, we reject the contention that the trial court properly denied respondent-father's motion because the lockdown at his prison occasioned by the COVID-19 pandemic was not an "extraordinary circumstance[ ]" within the meaning of N.C.G.S. § 7B-1109(d).

**B. The adjudicatory hearing held in respondent-father's absence did not meet the requirements of due process.**

We next consider whether the trial court's decision to deny respondent-father's motion to continue the adjudicatory hearing violated respondent-father's due process rights. As explained above, the Due Process Clause of the United States Constitution requires the State to "provide [ ] parents with fundamentally fair procedures" when seeking to terminate their parental rights. *In re Murphy*, 105 N.C. App. at 653 (quoting *Santosky*, 455 U.S. at 754). The requirements of due process are "flexible and call[ ] for such procedural protections as the particular situation demands." *Jones v. Keller*, 364 N.C. 249, 256 (2010) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). When assessing whether the requirements of due process have been met, courts consider "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure." *Santosky*, 455 U.S. at 754 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

¶ 23    It is indisputable that respondent-father has a "commanding" interest "in the accuracy and justice of the decision to terminate his [ ] parental status." *Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C.,* 452 U.S. 18, 27 (1981); *see also Price v. Howard*, 346 N.C. 68, 79 (1997) (recognizing "[a] natural parent's constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child"). This interest "weighs against the respondent's absence from the adjudicatory hearing." *In re Murphy*, 105 N.C. App. at 654. At the same time, it is indisputable that DSS possessed an "equally commanding" interest in the outcome of the proceeding. *Id*. at 655.

¶ 24    To be clear, the "countervailing government interest" at stake here was *not* an interest in rapidly terminating respondent-father's parental rights to facilitate Caleb's adoption. *Id*. Rather, DSS's interest was in protecting Caleb's welfare through a proceeding that reaches "a correct decision" regarding whether respondent-father's parental rights could and should be terminated. *Id*. While it may be the case that terminating respondent-father's parental rights was both legally permissible and in Caleb's best interest, neither proposition could be assumed; the reason a trial court conducts an adjudicatory hearing is to determine if grounds exist to lawfully terminate a parent's parental rights, and one of the purposes of the procedures created by our Juvenile Code is to "prevent[ ] the unnecessary or inappropriate separation of juveniles from their parents." N.C.G.S. § 7B-100(4) (2021); *cf. In re*

*A.C.F.*, 176 N.C. App. 520, 527 (2006) (recognizing "the State's interests in preserving the family" of a child whose parents are subject to termination proceedings). The State's interest in this proceeding necessarily partially overlapped with respondent-father's interest, in that both had a commanding interest in ensuring that the adjudicatory hearing helped the trial court reach the correct disposition of DSS's motion to terminate respondent-father's parental rights. *See In re K.M.W.*, 376 N.C. 195, 208 (2020) (recognizing that "fundamentally fair procedures" are "an inherent part of the State's efforts to protect the best interests of the affected children by preventing unnecessary interference with the parent-child relationship").

¶ 25        Because the parties largely agree that all parties to the adjudicatory hearing possessed a substantial interest in its outcome, "determination of whether respondent's federal due process rights have been violated turns upon the second *Eldridge* factor, risk of error created by the State's procedure." *In re Murphy*, 105 N.C. App. at 655. Respondent-father argues that his absence significantly increased the risk of an erroneous termination of his parental rights because (1) he was deprived of the opportunity to testify regarding topics central to the resolution of DSS's termination motion, and (2) his counsel did not have the opportunity to obtain the information about which respondent-father would have testified to at the hearing given that respondent-father was in lockdown for weeks preceding the hearing. In response, DSS and the GAL contend that the risk of error was minimal because

respondent-father was represented by counsel and the trial court admitted into evidence a report summarizing respondent-father's conduct while in prison. Although it is well established that "an incarcerated parent does not have an absolute right to be transported to a termination of parental rights hearing in order that he [or she] may be present under either statutory or constitutional law," *id.* at 652–53, we conclude that respondent-father's absence created a meaningful risk of error that undermined the fundamental fairness of this adjudicatory hearing.

¶ 26        The crux of DSS's termination motion—and the central factual basis for the trial court's termination order—was respondent-father's conduct while in prison. Each of the grounds asserted by DSS required an assessment of his conduct in light of the constraints imposed by his incarceration. Naturally, respondent-father possessed firsthand information regarding his conduct in prison that would have been relevant to the trial court's adjudication of these asserted grounds. This information included the availability of programs and services in his detention facility addressing the various components of his case plan, the effects of the COVID-19 pandemic on the availability of those programs, his efforts to avail himself of any existing programs and services during the time he was not a party to Caleb's juvenile proceeding, the progress he has made while enrolled in any programs or services, and his personal financial situation. The trial court needed this information to ensure that its adjudication was based on the specific facts of respondent-father's conduct in prison,

as opposed to facts necessarily attendant to the fact of respondent-father's incarceration in general. *Cf. In re A.G.D.,* 374 N.C. 317, 327 (2020) ("[T]he fact of incarceration is neither a sword nor a shield for purposes of a termination of parental rights proceeding."). Denying respondent-father's motion to continue deprived the court of a crucial source of information about a topic central to the court's resolution of the termination motion.

¶ 27     The presence of counsel representing respondent-father may have partially mitigated the unfairness of proceeding without respondent-father's participation. Counsel's representation ensured that someone would be at the adjudicatory hearing to advocate on respondent-father's behalf. Yet under the circumstances of this case, counsel's presence did not obviate the risk of error created by respondent-father's absence. Counsel was severely limited in his ability to elicit up-to-date information from respondent-father at or near the time of the hearing because respondent-father was incarcerated in West Virginia in a facility under COVID-19 lockdown. Indeed, when respondent-father's counsel e-mailed a prison official to schedule a meeting with respondent-father to prepare for the adjudicatory hearing, the official responded that respondent-father could not be made available for a meeting because the facility was under "lock down until Jan 25. No movement is available until then[.]"

¶ 28     Furthermore, while respondent-father's counsel did submit a report to the trial court containing a summary of respondent-father's conduct while in prison, the report

was admitted "so [respondent-father's] wishes will be known today," not to provide factual information rebutting the allegations DSS made in support of its termination motion. In addition, because respondent-father's counsel was unable to meet with respondent-father before the hearing, it is unclear whether the report provided up-to-date information regarding respondent-father's conduct in prison. Accordingly, even with the report, counsel could not adequately bridge the informational gaps created when respondent-father was unable to testify at the adjudicatory hearing.

¶ 29        The facts of this case stand in stark contrast to the facts of *In re Murphy*, upon which both DSS and the GAL rely. In *In re Murphy*, "respondent's attorney did not argue that his client would be able to testify concerning any defense to termination," and counsel "could point to no reason that the respondent should be transported to the hearing other than for respondent to contest his sexual assault convictions, an impermissible reason." 105 N.C. App. at 655. Denying the respondent-parent the opportunity to testify in that case did not deprive the court of any information relevant to the disposition of any legal claims. In addition, because the respondent-father in *In re Murphy* was incarcerated "[a]s the result of his being convicted of sexual offenses he committed against his own children," the Court of Appeals reasoned that "[r]espondent's presence at the hearing combined with his parental position of authority over his children may well have intimidated his children and influenced their answers if they had been called to testify." *Id*. Allowing the

respondent-parent to be present would have *exacerbated* the risk of error. By contrast, in this case respondent-father possessed information relevant to the legal question before the trial court, and there is no reason to believe that respondent-father's presence at the adjudicatory hearing would have interfered with the trial court's efforts to elicit truthful and candid testimony from other witnesses.

¶ 30        Under a different set of circumstances, the risk of error created by a respondent-parent's absence from an adjudicatory hearing might be outweighed by the State's interest in ensuring the efficient and orderly attainment of permanency for a juvenile. The State has a compelling interest in protecting a juvenile's welfare, and this interest both demands and justifies adherence to an expeditious process for determining when a natural parent's rights should be terminated. *Cf. In re D.L.H.*, 364 N.C. 214, 219 n.2 (2010) (noting in a juvenile delinquency matter that "the mandates of [a provision of the Juvenile Code] . . . encourage expeditious handling of juvenile matters"). But, under these circumstances, this interest was not meaningfully implicated by respondent-father's motion to continue the adjudicatory hearing. Respondent-father did not ask for an indefinite continuance, nor did he ask for a continuance until the end of the COVID-19 pandemic, whenever that may be. He asked to continue a hearing calendared for 20 January 2021 until some date after 25 January 2021 because the lockdown at his prison was scheduled to be lifted at that time. Under these circumstances, "[t]he State's interest in prompt resolution of

[termination] proceedings would not have been significantly affected by a brief continuance." *In re K.D.L.*, 176 N.C. App. 261, 265 (2006).

Similarly, under a different set of circumstances, the risk of error created by a respondent-parent's absence from an adjudicatory hearing might be negated by the presence of other witnesses who could provide the court with the same information the parent possesses. A trial court is required to "receive *some* oral testimony at the [adjudicatory] hearing," *In re T.N.H.*, 372 N.C. at 410 (emphasis added), but there is no requirement that the respondent-parent himself or herself be its source. Thus, in this case, had the trial court received testimony from a prison official or some other individual who could speak directly to respondent-father's conduct in prison, the presence of counsel might have adequately protected respondent-father's interest in avoiding an erroneous termination of his parental rights. *Cf. In re Barkley*, 61 N.C. App. 267, 270 (1983) (concluding that the trial court did not err by excluding a respondent-mother from the courtroom because her counsel was allowed to cross-examine a different witness possessing the same relevant substantive information). But no witness who could compensate for the informational deficiency created by respondent-father's absence was available at this adjudicatory hearing.

Procedural due process "is a flexible, not fixed, concept governed by the unique circumstances and characteristics of the interest sought to be protected." *Peace v. Emp. Sec. Comm'n of N. Carolina*, 349 N.C. 315, 323 (1998). The procedure necessary

"to [e]nsure fundamental fairness" will vary given the particular context of each case. *State v. Tolley*, 290 N.C. 349, 364 (1976) (cleaned up); *cf. In re D.W.*, 202 N.C. App. 624, 628 (2010) ("[A] case-by-case analysis is more appropriate than the application of rigid rules."). In this case the trial court's denial of respondent-father's motion for a brief continuance, which prevented respondent-father from testifying at a hearing where his parental rights were adjudicated, undermined the fairness of that hearing. Given respondent-father's inability to meet with counsel before the hearing because of the lockdown at his prison, the lack of any other testimony regarding respondent-father's conduct in prison, the centrality of factual questions regarding respondent-father's activities in prison to the court's examination of the asserted grounds for termination, and the magnitude of respondent-father's interest in avoiding an erroneous termination of his parental rights (which DSS shared), the trial court's denial of respondent-father's motion to continue was legal error.

## C. Respondent-father was prejudiced by the trial court's erroneous denial of his motion to continue the adjudicatory hearing.

Furthermore, we agree with respondent-father that he was prejudiced by the trial court's denial of his motion to continue the adjudicatory hearing. Although it is correct that reversal is warranted only upon a showing of prejudice "whether the motion raises a constitutional issue or not," *Walls*, 342 N.C. at 24, our prejudice analysis is different when the trial court commits a constitutional error. When the trial court's denial of a respondent-parent's motion to continue violates that parent's

due process rights, the "harmless error" standard applies: specifically, the challenged order must be overturned unless "the error was harmless beyond a reasonable doubt," and DSS bears the "burden" of proving that the error was harmless. *State v. Scott*, 377 N.C. 199, 2021-NCSC-41, ¶ 10; *cf. In re T.D.W.*, 203 N.C. App. 539, 545 (2010) (applying harmless error analysis to a due process violation in termination of parental rights context). Under these circumstances, we are unpersuaded that the trial court's denial of respondent-father's motion to continue the adjudicatory hearing was harmless beyond a reasonable doubt.

¶ 34        In general, to demonstrate prejudice resulting from the denial of a motion to continue an adjudicatory hearing, a respondent-parent should indicate what the parent's "expected testimony" will address and "demonstrate its significance" to the trial court's adjudication of the grounds for termination. *In re A.L.S.*, 374 N.C. at 518. The "better practice [is] to support a motion for continuance with" an "affidavit or other offer of proof." *Id.* (citing and quoting *State v. Cody*, 135 N.C. App. 722, 726 (1999)). Respondent-father's counsel did not submit an affidavit or other offer of proof in support of the continuance motion here. Yet respondent-father's counsel had no means of eliciting the information necessary to support such an affidavit or other offer of proof—counsel's inability to contact respondent-father and arrange for his testimony at the hearing because of circumstances beyond the control of either of

them was a principal justification for seeking the continuance.[3] Trial counsel did state that respondent-father "is standing behind testifying before the [c]ourt" and that he would "vociferously refute the . . . position to terminate [his] parental rights." In addition, in a brief to this Court, appellate counsel described the information respondent-father would have provided had he been permitted to testify. Accordingly, in assessing prejudice, we consider these arguments regarding the consequences of the trial court's refusal to grant a continuance.

¶ 35        As the Court of Appeals has correctly observed, although parents do not have an absolute right to be present and testify at a hearing where their parental rights are being adjudicated, "[g]enerally, we consider the testimony of a parent to be a vital source of information regarding the nature of the parent/child relationship and the necessity of terminating parental rights." *In re D.W.*, 202 N.C. App. at 629. Parental testimony is especially vital when it addresses facts that are central to the trial court's adjudication of asserted grounds for termination and when no other witness

---

[3] DSS argues that it is "disconcerting" that respondent-father called his own father on "the morning of the termination hearing . . . but did not take the initiative to call his attorney." Although the transcript of the adjudicatory hearing does indicate that respondent-father spoke with his own father on the morning of the hearing, there is no evidence in the record suggesting respondent-father had the means or opportunity to appear at the adjudicatory hearing or otherwise meaningfully participate in preparing for the hearing with his attorney. As noted above, when respondent-father's counsel attempted to contact respondent-father at his detention facility, a prison official told counsel that any such contact would be impossible due to the lockdown. Even respondent-father's father's testimony supports the conclusion that the lockdown significantly inhibited efforts to communicate with respondent-father—according to the testimony, respondent-father was only able to call his father during a brief window when he was released from lockdown earlier that morning.

is available who can accurately convey to the court the information the parent possesses.

Here, the trial court's decision to terminate respondent-father's parental rights necessarily depended upon its assessment of respondent-father's conduct within the context of his case plan and the constraints of his incarceration. Every ground asserted by DSS and found by the trial court required careful parsing of these facts to ensure that respondent-father's parental rights were being terminated because of his conduct, not because of his incarceration. *Cf. In re K.N.*, 373 N.C. 274, 283 (2020) ("[R]espondent's incarceration, by itself, cannot serve as clear, cogent, and convincing evidence of neglect. Instead, the extent to which a parent's incarceration or violation of the terms and conditions of probation support a finding of neglect depends upon an analysis of the relevant facts and circumstances, including the length of the parent's incarceration."). Respondent-father asserts that he would have testified to "the fitness of *all* appropriate caregivers" he identified as alternative placements for Caleb, "[e]vidence of [his] ability and efforts to work toward reunification with Caleb when he was not a party to the case," "[e]vidence of [his] ability to pay a reasonable portion toward Caleb's cost of care in the six months preceding the filing of the termination motion," "[e]vidence of [his] progress in the rehabilitative programs he was taking in prison to the date of the termination hearing," and "updated evidence about his release date." No other witness was present who could supply the court with

this factual information.

¶ 37          The absence of information regarding respondent-father's conduct while in prison plainly had a "possible impact upon the actual hearing or the ensuing order by the trial court." *In re T.H.T.*, 362 N.C. 446, 453 (2008). DSS and the GAL have not met their burden of proving beyond a reasonable doubt that the trial court's violation of respondent-father's due process rights was harmless. Accordingly, respondent-father was prejudiced when he was denied the opportunity to be heard at the adjudicatory hearing "in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

## IV.    Conclusion.

¶ 38          In this case, respondent-father was unable to attend the hearing during which his parental rights were adjudicated because the prison in which he was living was under lockdown due to the COVID-19 pandemic. He requested a brief continuance until the lockdown was lifted to enable him to prepare for the hearing with his attorney and to testify on his own behalf. The grounds for terminating respondent-father's parental rights all required the trial court to carefully assess his conduct while in prison. No other witness with direct knowledge of that information was available to testify at the hearing. Ultimately, the trial court terminated respondent-father's parental rights.

¶ 39          The purpose of an adjudicatory hearing is to determine whether the State's

interest in protecting the welfare of a child requires displacing a parent's "constitutionally[ ] protected paramount right . . . to custody, care, and control of [his or her] children." *Owenby*, 357 N.C. at 145 (quoting *Petersen v. Rogers*, 337 N.C. 397, 403–04 (1994). That right "is a 'fundamental liberty interest' which warrants due process protection." *In re Montgomery*, 311 N.C. 101, 106 (1984) (quoting *Santosky*, 455 U.S. at 759). By denying respondent-father's motion to continue the adjudicatory hearing, the trial court violated respondent-father's due process rights and undermined the fundamental fairness of the hearing. Accordingly, we vacate the order terminating respondent-father's parental rights and remand this case to the trial court for further proceedings not inconsistent with this opinion.

VACATED AND REMANDED.

Chief Justice NEWBY dissenting.

The task here is to determine whether the trial court erred in terminating respondent-father's parental rights. Respondent presents two bases for why the trial court's order should be vacated. He first argues that the trial court's denial of his motion to continue the termination of parental rights (TPR) hearing violated his right to due process because he was unable to attend the hearing virtually. Additionally, respondent contends that sufficient grounds did not exist for the trial court to terminate his parental rights under N.C.G.S. § 7B-1111(a)(1), (2), (3), or (6). In order for respondent to prevail on appeal, however, he must establish that if he were virtually present at the hearing, the trial court would not have terminated his parental rights under *any* of the alleged grounds. Here respondent is unable to show that but for his absence, the trial court would not have terminated his parental rights for willful failure to pay a reasonable portion of Caleb's cost of care for the six-month period immediately preceding the filing of the TPR motion. *See* N.C.G.S. § 7B-1111(a)(3) (2021). Thus, he cannot prevail on appeal. The trial court's order terminating respondent's parental rights should be affirmed. I respectfully dissent.

On 28 August 2020, the Alamance County Department of Social Services (DSS) filed a motion to terminate respondent's parental rights to Caleb based, *inter alia*, upon respondent's willful failure to pay a reasonable portion of Caleb's cost of care pursuant to N.C.G.S. § 7B-1111(a)(3). Notably, during the relevant six-month period preceding the filing of the TPR motion, respondent contributed zero dollars toward

Caleb's cost of care despite being employed in the dining room of the prison facility where he was incarcerated and receiving funds from his family. A hearing on the TPR motion was originally scheduled for 21 October 2020 but continued to 16 December 2020 and again continued to 20 January 2021.

¶ 42        On 12 January 2021, respondent moved to continue the TPR hearing for a third time, arguing he would otherwise be unable to attend the hearing virtually due to a COVID-19 lockdown at the prison. In respondent's motion to continue, he argued that "due process demands [his] presence at th[e] hearing to determine if the state will strip him of his constitutionally protected parental rights." Respondent further contended that denying the requested continuance would render him unable to testify and thus unable to defend his constitutional right to care for his child. The trial court made the following findings with respect to respondent's motion:

> 2.    That at the call of the hearing, [respondent's counsel] was heard on his written motion to continue the hearing on termination of parental rights. He indicated to the court that [respondent] could not attend the hearing due to the prison being on lock down due to the COVID-19 pandemic.
>
> 3.    That this motion to terminate parental rights was filed August 28, 2020 and initially scheduled for hearing on October [21], 2020. That hearing was continued at the request of [respondent's] attorney and scheduled for December 16, 2020. That hearing was continued at no fault of anyone involved in this matter.
>
> 4.    [Respondent's counsel] reports the lock down is

scheduled to be lifted January 25, 2021. However, no one knows for sure how COVID-19 will continue to impact the prison system.

5.   That hearings on motions to terminate parental rights are required to be heard within 90 days of filing. This case is already outside the required timeframe. [Respondent] and his attorney have had an extended period of time to prepare for this matter.

6.   That [respondent's] attorney will be present at the hearing and permitted to cross exam[ine] witnesses and present evidence. That [respondent's] report is admitted into evidence as well as his exhibits by the consent of the parties. These processes assure the due process rights of [respondent] are being honored and the adversary nature of the proceeding is preserved.

7.   [Respondent] and [DSS] both have a commanding interest in this proceeding.

8.   That due to the fundamental fairness of the process, representation of counsel for [respondent] and other processes, the risk of error by not having [respondent] present is low.

The trial court denied respondent's motion. After the hearing on 20 January 2021, the trial court determined that grounds existed to terminate respondent's parental rights based upon neglect, willfully leaving Caleb in foster care or placement outside the home without correcting the conditions which led to his removal, willfully failing to pay a reasonable portion of the cost of Caleb's care, and dependency. *See* N.C.G.S. § 7B-1111(a)(1), (2), (3), (6).

¶ 43        On direct appeal before this Court, respondent now argues the trial court violated his right to due process when it denied his motion to continue the TPR

hearing because it rendered him unable to testify at the hearing. Even assuming, without deciding, that the trial court erred in denying respondent's motion, respondent cannot prevail on appeal because he cannot show that he was prejudiced by such an error.[1]

¶ 44    " 'When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures,' which meet the rigors of the due process clause." *In re Murphy*, 105 N.C. App. 651, 653, 414 S.E.2d 396, 397 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S. Ct. 1388, 1394 (1982)), *aff'd per curiam*, 332 N.C. 663, 422 S.E.2d 577 (1992). Nonetheless, an incarcerated parent does not have an absolute right to be present at a TPR hearing. *In re Murphy*, 105 N.C. App. at 652–53, 414 S.E.2d at 397. As such, "[w]hen . . . a parent is absent from a termination proceeding and the trial court preserves the adversarial nature of the proceeding by allowing the parent's counsel to cross examine witnesses, with the questions and answers being recorded, the parent must demonstrate some actual prejudice in order to prevail upon appeal." *Id.* at 658, 414 S.E.2d at 400. In other words, a respondent must show that "there is a reasonable probability that, but for [his absence], there would have been a different result in the proceedings." *In re*

---

[1] The analysis required to determine prejudice is comparable to that required by the second *Eldridge* factor—i.e., the risk of error caused by respondent's absence. Because this Court should decide this case under the prejudice analysis, an analysis of the *Eldridge* factors is unnecessary.

*T.N.C.*, 375 N.C. 849, 854, 851 S.E.2d 29, 33 (2020) (quoting *State v. Braswell*, 312 N.C. 553, 563, 324 S.E.2d 241, 248 (1985)).

¶ 45        Here the trial court preserved the adversarial nature of the proceedings because respondent was represented by counsel, who presented evidence, called a witness, and cross-examined witnesses at the TPR hearing. Though "a finding of only one ground is necessary to support a termination of parental rights," *In re A.R.A.*, 373 N.C. 190, 194, 835 S.E.2d 417, 421 (2019), the trial court found that grounds existed to terminate respondent's parental rights under N.C.G.S. § 7B-1111(a)(1), (2), (3), and (6). Therefore, to prevail on appeal, respondent must show that if he were permitted to testify at the hearing, the trial court would not have terminated his parental rights based upon *any* of the above grounds.

¶ 46        Respondent's presence at the hearing would not have changed the trial court's adjudication under N.C.G.S. § 7B-1111(a)(3). A trial court may terminate a parent's parental rights under this ground when

> [t]he juvenile has been placed in the custody of a county department of social services, a licensed child-placing agency, a child-caring institution, or a foster home, and the parent has for a continuous period of six months immediately preceding the filing of the petition or motion willfully failed to pay a reasonable portion of the cost of care for the juvenile although physically and financially able to do so.

N.C.G.S. § 7B-1111(a)(3). We have recently explained that termination under N.C.G.S. § 7B-1111(a)(3) is proper "where the trial court finds that the respondent

has made no contributions to the juvenile's care for the period of six months immediately preceding the filing of the petition and that the respondent had income during this period." *In re J.E.E.R.*, 378 N.C. 23, 2021-NCSC-74, ¶ 18.

¶ 47        Here the trial court found that

> 13.  [Respondent] entered into the Alamance County Jail on May 21, 2018 and has not left incarceration since that date.
>
> . . . .
>
> 16.  The juvenile has been alive 726 days. Out of these 726 days, he has been in DSS custody 725 days. He has never lived with [respondent].
>
> . . . .
>
> 46.  [Respondent] receives financial assistance while incarcerated from his mother and other family members/friends. He also works within the prison and receives a small amount of pay.
>
> 47.  [DSS] has expended over $10,000.00 for the cost of care of the juvenile.
>
> 48.  The petition to terminate parental rights was filed August 28, 2020. The relevant six month period for determination if [respondent] has paid his reasonable portion of the cost of care is from February 28, 2020 until August 28, 2020. During that period of time, [respondent] paid zero dollars towards the cost of care for the juvenile.
>
> 49.  [Respondent] has the ability to pay more than zero towards the cost of care for the juvenile, as demonstrated by the money he provided in September of 2020, and has willfully failed to pay such.

¶ 48    Respondent challenges finding of fact 49, arguing the record does not support any finding that he had the ability to pay an amount greater than zero dollars toward Caleb's cost of care during the relevant period. The record, however, includes two individualized needs plans for respondent, which indicate that respondent was employed in the dining room of the prison facility at least from 12 November 2019 to 22 July 2020, almost the entirety of the relevant six-month period. Moreover, Christy Roessler, a DSS social worker, testified that respondent had access to money to help with Caleb's cost of care because respondent was being paid for his work at the prison and was receiving funds from his family. Though respondent sent thirty-five dollars to Caleb on 9 September 2020, demonstrating his ability to pay some amount, he paid nothing during the relevant six-month period. Therefore, the trial court's finding that respondent had the ability to pay more than zero dollars during the relevant period is supported by the record evidence. Since respondent made no contributions to the cost of Caleb's care during the relevant period despite having some income, the trial court properly terminated his parental rights pursuant to N.C.G.S. § 7B-1111(a)(3).

¶ 49    The majority states that the trial court was required to consider "up-to-date" testimony from respondent regarding his good behavior in prison. According to the majority,

> the trial court's decision to terminate respondent-father's parental rights necessarily depended upon its assessment of respondent-father's conduct within the context of his case plan and the constraints of his incarceration. Every

> ground asserted by DSS and found by the trial court required careful parsing of these facts to ensure that respondent-father's parental rights were being terminated because of his conduct, not because of his incarceration.

As such, the majority erroneously concludes that respondent's absence "created a meaningful risk of error that undermined the fundamental fairness of this adjudicatory hearing" because the trial court was unable to consider relevant, up-to-date information regarding respondent's conduct in prison.

¶ 50 As explained above, however, the trial court's adjudication under N.C.G.S. § 7B-1111(a)(3) did not require an understanding of respondent's current conduct.[2] Rather, it merely required the trial court to find two facts: (1) that respondent had some income during the relevant period and thus the ability to pay something; and (2) that respondent contributed zero dollars toward Caleb's cost of care. Since the relevant period for adjudication under N.C.G.S. § 7B-1111(a)(3) consisted of the six months immediately preceding the filing of the TPR motion, the facts necessary to support termination under this ground were finalized on the date the TPR motion was filed. As such, the trial court did not need to hear "up-to-date" testimony from respondent about his subsequent good behavior in prison.

¶ 51 The majority is thus unable to articulate what evidence respondent's testimony

---

[2] Though respondent's conduct at the time of the hearing may have been relevant to adjudication of some of the other grounds alleged, his conduct after 28 August 2020 had no bearing on the trial court's N.C.G.S. § 7B 1111(a)(3) determination.

would have offered that could have altered the trial court's adjudication under N.C.G.S. § 7B-1111(a)(3). Respondent presented no offer of proof before the trial court. On appeal, respondent also failed to specify any facts showing that he did not have income during the relevant period. Rather, respondent, and now the majority, merely asserts that respondent would have presented "[e]vidence of [his] ability to pay a reasonable portion toward Caleb's cost of care in the six months preceding the filing of the termination motion." What exactly such evidence is remains unknown. This conclusory assertion is not sufficient to show that respondent's testimony would have rendered a different result under N.C.G.S. § 7B-1111(a)(3). It is clear that respondent had income but paid nothing. Notably, if contrary evidence existed, then respondent could have included it in his report, which was admitted into evidence.

¶ 52      The majority excuses respondent's counsel's failure to present an offer of proof by claiming that "[c]ounsel was severely limited in his ability to elicit up-to-date information from respondent-father at or near the time of the hearing because respondent-father was incarcerated in West Virginia in a facility under COVID-19 lockdown." However, all of the information needed to defend against the termination of respondent's parental rights under N.C.G.S. § 7B-1111(a)(3) had been available since the TPR motion was filed on 28 August 2020. Certainly, in preparing for the two previously scheduled TPR hearings in October and December of 2020, any relevant information would have been available to respondent's counsel. Therefore,

the 145-day period between the filing of the TPR motion and the hearing, including the two scheduled hearings, provided respondent and his counsel sufficient time and incentive to prepare a defense to termination under N.C.G.S. § 7B-1111(a)(3).

¶ 53          Furthermore, the trial court found that

> [respondent] called [the paternal grandfather] before this hearing and they spoke for approximately thirty minutes. Although the federal penitentiary is on a COVID shutdown right now and would not allow [respondent] to participate in this hearing via WebEx, they do allow some telephone communication with the outside world. [Respondent] did not call his attorney during this time.

This finding is supported by the paternal grandfather's testimony that he spoke to respondent the morning of the TPR hearing for about thirty minutes. As such, it is binding on appeal. *See In re C.H.M.*, 371 N.C. 22, 28, 812 S.E.2d 804, 809 (2018) ("[A] trial court's findings of fact 'are conclusive on appeal if there is competent evidence to support them.'" (quoting *In re Skinner*, 370 N.C. 126, 139, 804 S.E.2d 449, 457 (2017))). Instead of calling the paternal grandfather on the morning of the TPR hearing, respondent could have called his counsel to prepare for the hearing. Therefore, the majority's contention that respondent's counsel was unable to sufficiently prepare for the hearing is without merit.

¶ 54          Moreover, the majority concludes that the COVID-19 lockdown constituted an "extraordinary circumstance" under N.C.G.S. § 7B-1109(d), which *required* the trial court to continue the hearing. *See* N.C.G.S. § 7B-1109(d) (2021). N.C.G.S.

§ 7B-1109(d), however, does not require that a trial court grant a continuance but merely gives a trial court the authority to do so if it finds that extraordinary circumstances exist. *See State v. Phillip*, 261 N.C. 263, 266, 134 S.E.2d 386, 389 (1964) ("Ordinarily a motion for continuance is addressed to the sound discretion of the trial judge and his ruling thereon is not subject to review on appeal except in a case of manifest abuse."). Here the trial court acted within its discretion when it considered the circumstances surrounding the COVID-19 lockdown and determined that a continuance was not necessary.[3]

¶ 55 The trial court in the present case appropriately found that grounds existed to terminate respondent's parental rights under N.C.G.S. § 7B-1111(a)(3). Even if respondent testified regarding his "up-to-date" conduct while incarcerated, the trial court's adjudication under N.C.G.S. § 7B-1111(a)(3) would have remained the same. Respondent cannot show prejudice and thus cannot prevail on appeal. Since a finding of only one ground was necessary to support the trial court's TPR order, there is no need to address the remaining grounds. The trial court's order terminating respondent's parental rights should be affirmed. I respectfully dissent.

Justices BERGER and BARRINGER join in this dissenting opinion.

---

[3] In reaching a contrary conclusion, the majority gives weight to the fact that respondent only requested a five-day continuance. Unlike the trial court, however, the majority has no familiarity with the court calendar in Alamance County and thus cannot know when this case could have been rescheduled. Thus, such a consideration is better left to the sound discretion of the trial court.